CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
ELENA SADOWSKY (Bar No. 302053)
(E-Mail: Elena_Sadowsky@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
JULIE ANN RAINBIRD

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| UNITED STATES OF AMERICA, | Case No. 2:22-cr-00347-MCS-1 |
|---|---|
| Plaintiff, | **DEFENDANT'S OBJECTIONS TO THE PRESENTENCE REPORT AND SENTENCING POSITION** |
| v. | |
| JULIE ANN RAINBIRD, | Sentencing Date: August 21, 2023 |
| Defendant. | Sentencing Time: 3:00 p.m. |

Defendant Julie Ann Rainbird, through her counsel of record, Deputy Federal Public Defender Elena Sadowsky, submits her objections to the presentence report and sentencing position.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: August 8, 2023     By */s/ Elena Sadowsky*
ELENA SADOWSKY
Deputy Federal Public Defender
Attorney for JULIE ANN RAINBIRD

## I. INTRODUCTION

For nearly three decades, drug and alcohol dependence fueled in part by intimate partner abuse, has been the defining feature of Ms. Rainbird's life. Her methamphetamine and alcohol addiction has eroded her most important relationships, consumed her potential, and contributed directly and indirectly to a lengthy history of arrests and convictions. After an unfortunate, but all-too common pattern of revolving state-court convictions, Ms. Rainbird is before this federal Court after accepting responsibility for bank fraud and possession of fifteen or more access devices--offenses she committed in 2018 and 2019. Though Ms. Rainbird's adult life has been difficult and she has experienced years of physical, mental, and emotional abuse, these plights do not define who she is, or importantly, who she is ready to be: as discussed below, she has demonstrated a real commitment to rehabilitation in the last four years and is amendable to help and treatment.

Ms. Rainbird understands that a custodial sentence is appropriate here. She also understands that the Court likely has legitimate concerns about risk of recidivism, protection of the public, and deterrence. She submits, however, that the most effective way to further those goals and prevent this from happening again is to provide well-rounded treatment and the opportunity to continue her demonstrated commitment to rehabilitation. Prior to her arrest in 2019, Ms. Rainbird had never participated in meaningful drug treatment or therapy to help her work through her diagnosis of post-traumatic stress disorder and substance use disorders. A sentence of 41, which corresponds to the low-end of the 2023 amended sentencing guidelines adequately captures her serious criminal history, while still recognizing the mitigating circumstances in her background, her untreated addiction and PTSD. Additionally, the federal sentence should run concurrent to the state sentence she is currently serving because the conduct overlaps and because a concurrent sentence will allow Ms. Rainbird to return to the state rehabilitative program (CCTRP) where she was making great progress before being cut short by the federal warrant.

## II. OBJECTIONS TO THE PRESENTENCE REPORT

Ms. Rainbird submits the following objections to the presentence report:

- On page 1 (Release Status): While Ms. Rainbird made her initial appearance in this district on October 17, 2022, she was actually transferred to federal custody on October 14, 2022 when the U.S. Marshals picked her up from CDCR custody.
- Page 2 (Detainers) and ¶ 57: Counsel was recently able to clear this warrant on behalf of Ms. Rainbird. *See* Ex. E (Order Recalling Warrant). Ms. Rainbird requests an updated PSR reflecting that there are no active warrants.
- On page 2 (Aliases): Ms. Rainbird objects to having a "gang name." The nickname "Jules" is simply a nickname.
- The PSR assigns a two criminal history points for Ms. Rainbird having committed the offense while on probation in another case. PSR ¶ 66. While technically correct under the current Sentencing Guidelines, an amended guideline is set to go into effect on November 1, 2023. Under amended U.S.S.G. § 4A1.1, a defendant will receive just one point if she otherwise has seven or more points and committed the instant offense while on probation.[1] The Court should give Ms. Rainbird the benefit of the amended guideline now. Applying the amended guideline, Ms. Rainbird would have 12 criminal history points and would be in Criminal History Category V. Her advisory guidelines range is therefore 41-51 months.
- ¶ 83: Ms. Rainbird was 17 years old (two months before, not after, her 18th birthday) when she married her first husband, whose last name is spelled "Bargy" not "Borgi."

---

[1] *See* Amendments to the Sentencing Guidelines, available at: chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230405_prelim-RF.pdf (see page 70-71 of 183)

3

### III. SENTENCING POSITION

**A.  Ms. Rainbird's adult life has been marked by untreated addiction and unaddressed trauma.**

Ms. Rainbird was adopted by loving parents who provided a comfortable home for her and her two adopted siblings in the San Fernando Valley. Though she looked different from her blonde, blue-eye family members, she never felt like an outsider in her family and never felt the desire to search for her biological parents. Ms. Rainbird only has praise for her parents and touts their love and support. While they certainly deserve that praise, like all parents, they are not without fault. As a child, Ms. Rainbird did not grow up with boundaries, rules, punishments, or discussions about consequences. As Ms. Rainbird began to experiment with rule-breaking and partying as a teenager, there was little to no pushback from her parents. For example, when she came home from a party obviously drunk and sick from excess drinking, her mother's only response was to joke the next morning, "how's that hangover?" There were no discussions about safety or the consequences of drug and alcohol use. When, at just 17 years old, she announced she would be marrying her 20-year-old boyfriend, her parents didn't bat an eye. There was no discussion about whether she was ready (or old enough for that matter) for marriage, about the responsibilities of marriage, or the impact it might have on her future. And, when Ms. Rainbird again decided to leave high school as a teenager, she did so without any protest from her parents.

Despite the supportive environment and her parent's likely best intentions, all three of the Rainbird children would become afflicted by drug and/or alcohol addiction. Her brother is a recovering alcoholic who was able to get clean after this third DUI. Ms. Rainbird's sister, who introduced Ms. Rainbird to methamphetamine, is still in the throes of addiction and Ms. Rainbird has had no contact with her in many years. These observations are not meant to villainize her parents or to suggest that they are responsible for Ms. Rainbird's actions as an adult. Rather, they provide some context

for the rocky road she has faced as an adult despite being raised in a relatively "good" environment.

As an adult, Ms. Rainbird jumped from one toxic relationship to the next. She suffered physical, mental, and emotional abuse on top of general disfunction and distrust. Each relationship contributed to her alcohol and drug dependence and criminal behavior, culminating in the final straw in May 2019. It is only now that she had begun to unravel her twisted romantic history to understand the wrongs she has inflicted and those that have been inflicted upon her.

### 1. Dave Bargy

Ms. Rainbird first married when she was just 17 years old to 20-year-old Dave Bargy. The marriage was short-lived, lasting six months before separation. The couple reunited and had one daughter together, but that reunion was also short-lived. When their daughter was 2.5 years old, Mr. Bargy left and neither Ms. Rainbird nor her daughter ever heard from him again. At the age of 22, Ms. Rainbird was a single mother without any financial support from her ex-husband. She decided to move back in with her parents who helped support her and her young child.

### 2. Craig Fehlman

Shortly after moving back home, Ms. Rainbird met Craig Fehlman and the couple had a daughter almost immediately, followed by another girl a few years later. The family moved to Utah, which was difficult on Ms. Rainbird for a variety of reasons. It was the first time she had lived away from her parents. She was raising three young girls now without familial support. Far away from her parents and her childhood home, Mr. Fehlman became verbally, emotionally, and physical abusive. It was during this 10-year relationship that Ms. Rainbird became a "full-blown" alcoholic. She drank every day. She lost many jobs because her drinking interfered with her work; she showed up late, had a bad attitude, and constantly moved around. The relationship was tumultuous, which led to physical confrontations and lots of pushing and shoving. At one point, Mr. Fehlman kicked Ms. Rainbird out of the house and her parents had to

drive from California to Utah to pick her and the kids up and bring them home. The divorce process was "brutal" and included a nasty custody battle.

### 3. Steve Voigt

In the early 2000s, Ms. Rainbird began a relationship with Steve Voigt, who was an even worse abuser than Mr. Fehlman. The pair moved to Indiana, which was extremely detrimental to Ms. Rainbird's life. Her children remained in California because Ms. Rainbird was not permitted to take them out of state. She travelled when she could to visit them but the separation allowed her to lose sign of herself and her goals. Her drinking intensified. Ms. Rainbird began working as a bartending, which, of course, did not help her alcoholism. Mr. Voigt was an alcoholic too, drinking at least a case of beer every day. When he drank, he became especially abusive. She recalls that he called her "'stupid fucking bitch' so often that she thought it was her name." He repeatedly kicked her out of the house, which meant that she would sleep outside in the carport during the Indiana winter. There were times where she felt hopeless. At one point, Ms. Rainbird's daughter found her unresponsive having overdosed on pills and had to call the 9-1-1 to save her life.

### 4. Steve Zirnite

Ms. Rainbird was in a relationship with Steve Zirnite from 2011 to 2018 (married in 2017). Mr. Zirnite was arrested eight months into their relationship and Ms. Rainbird supported him throughout his 2-year sentence. Once he completed the sentence, she didn't hear from him. But when she received a substantial inheritance form her parents and was able to get a stable housing for herself, her daughter, and granddaughter, Mr. Zirnite resurfaced. Despite the abandonment and clear signs that she was being used, Ms. Rainbird accepted him back into her life. But the relationship was extremely dysfunctional.

The relationship ended in 2018 when Ms. Rainbird discovered through her home security system that Mr. Zirnite was having an affair with her daughter. Ms. Rainbird also discovered that Mr. Zirnite was visiting sex chat rooms and hooking up with other

people. After the shocking discovery, Ms. Rainbird moved out of her own home and began jumping from motorhome to motel back to motorhome and so on. She began numbing herself with drugs and alcohol and she spiraled out of control. Though she had been an addict for decades before this, this time felt different. Her usage intensified. She was broken. Surrounded by other addicts, her possessions and vehicles were constantly being stolen and impounded. She repeatedly turned to small fraud-like crimes to stay afloat and support her own habit. It all came to ahead on May 21, 2019, when she was arrested after a high-speed chase in the fraudulently purchased mobile home.

**B.    Ms. Rainbird has demonstrated a commitment to rehabilitation in the last four years.**

Perhaps more salient than her past is Mr. Rainbird's transformation since her arrest in May 2019. For the last four years, Ms. Rainbird has demonstrated a commitment to rehabilitation even before she knew about this federal case.

First, in September 2019, Ms. Rainbird was baptized while in local custody and religion has played an important role in her life since. She found a pen pal who helps her in her religious journey and she credits religion with giving her a new outlook on life. It has taught her the importance of forgiveness. She has worked on forgiving others and herself but, perhaps more importantly, she has recognized the harms that she has caused and the forgiveness she must seek from her loved ones and the victims of her actions.

Shortly before being sentenced in the state case, Ms. Rainbird was diagnosed with major depressive disorder, post-traumatic stress disorder, panic disorder, as well as several substance use disorders. PSR ¶ 109-110. She reflects on that diagnosis often. It has brought clarity and understanding of her distant and recent past and it has informed and motivated her rehabilitation journey. Because most jails and prisons suspended programming during the pandemic, Ms. Rainbird had scant resources available to manage her addiction and participate in programming. Nonetheless, she has remained

sober (despite it being all around her), which has been the longest period since she was a teenager. Though programming was limited, Ms. Rainbird was proactive in her rehabilitation and signed up for mail-in and self-study self-help programs. Counsel was unable to obtain the majority of her certificates from her time in state custody, but Ms. Rainbird participated in a variety of classes, including domestic violence, anger management, and self-reflection courses. Her more recent certificates are enclosed as Exhibit B.

After demonstrating a commitment to rehabilitation in state custody Ms. Rainbird entered the holy grail of programming in May 2022 -- the Custody to Community Transitional Reentry Program (CCTRP).[2] Notably, Ms. Rainbird was engaged in self help and productive programming before she knew about the federal warrant. Though CCTRP, inmates are allowed to serve their sentence in the community as opposed to in prison. They wear an ankle monitor and participate in several different types of programming and job training to facilitate reentry into society. Ms. Rainbird began the program in May 2022 and quickly moved through Phase 1 and Phase 2 of the program. During Phase 2 (the vocational training phase), Ms. Rainbird practiced interviewing and other job training skills. She worked on her resume, performed job searches, obtained proper identification, and participated in mock interviews. She was told that her mock interview was the best one that the interviewer had seen in her six years at the program. She had received approval to begin working in the community and planned to work as a waitress at IHOP while also pursuing higher education part-time. She was just one week away from entering Phase 3 (the final phase) when CCTRP was notified on August 31, 2022 that Ms. Rainbird had a federal warrant and had to be returned to prison. The surprise warrant and disruption of her rehabilitation plan was devastating to Ms. Rainbird. It cut short the amazing progress she made in state custody. But to her credit, Ms. Rainbird did not wallow in her emotions or give

---

[2] More information available at: https://www.cdcr.ca.gov/rehabilitation/pre-release-community-programs/custody-to-community-transitional-reentry-program/

up. She resumed programming as best she could with the limited resources at MDC, participating in the non-residential drug program and other self-help classes on personal growth and trauma, pursuing education with courses in grammar and geometry, and working as an orderly for the past several months. The NRDAP class meets for several hours each week. It began with 20 people but now just nine are enrolled. Ms. Rainbird believes she is scheduled to graduate from the program this month. Importantly, if returned to state custody, Ms. Rainbird can return to the CCTRP program to finish out her sentence.

"[A] court's duty is always to sentence the defendant as he stands before the court on the day of sentencing." *United States v. Bryson*, 229 F.3d 425, 426 (2nd Cir. 2000) (quoted with approval in *Pepper v. United States*, 562 U.S. 476, 491 (2011)). For the first time in many years, Mr. Rainbird sees a positive future for herself and wants to reform her life. Perhaps most importantly, she finally believes that she deserves that life. Given her starting point at the time of her arrest, Mr. Rainbird's rehabilitation is significant, shows that she is motivated to succeed when she is released, and further supports the defense's recommended concurrent sentence.

**C. Though Ms. Rainbird accepts full responsibility for her past and present, her untreated addiction and trauma contextualize her actions, criminal history, and the appropriate sentence.**

This Court has undoubtedly seen hundreds of cases involving addicts who, focused narrowly on their dependence, turn to theft or other criminal conduct in the hopes of temporary relief. The question of how to deal with the effects of addiction is one that sentencing courts have grappled with for decades. In the past, drug dependency was often seen as a failure of will, unmentioned entirely, or seen as correlative with life circumstances, but with limited explanatory power. Conduct influenced by its effects

//

//

often received unmitigated harsh treatment, or sometimes even enhanced punishment due to a perceived risk of reoffending.[3]

More recently, however, scientific and medical advances have produced new insights into the culpability of drug-dependent offenders. "While addiction was once thought of as merely a moral failure," it is now recognized "as a serious medical condition." *United States v. Hendrickson*, 25 F.Supp.3d 1166, 1172 (N.D. Iowa 2014) (Bennett, J.). Acknowledging that Ms. Rainbird's criminal history and conduct is part of a pattern impacted by an extended period of heavy drug use is not meant to suggest that she lacks all agency or shouldn't be held responsible for her actions. But it *is* an effort to more realistically evaluate culpability and intent, which have been the central organizing principles of criminal punishment for thousands of years.

The goal of criminal sentencing is not only to punish offenders for their transgressions, but also to enable them to contribute to society upon release. A 41-month sentence to run concurrent to the state sentence – coupled with three years of supervised release – will balance the need for punishment with Ms. Rainbird's need for treatment, give her the best opportunity to productively reenter society, and result in a sentence that is sufficient, but not greater than necessary, to achieve all the purposes of federal sentencing.

**D.  The Court should adjust the federal sentence to credit Ms. Rainbird for the state time served thus far and run the remainder of the federal sentence concurrent to her state sentence.**

The PSR correctly notes that Case No. PA092808 for which Ms. Rainbird pleaded guilty and received an 8-year sentence is relevant conduct under USSG

---

[3] Volkow, *Preface to National Institute on Drug Abuse, Drugs, Brains, and Behavior: The Science of Addiction* 1 (2010) ("Science of Addiction") ("When science began to study addictive behavior in the 1930s, people addicted to drugs were thought to be morally flawed and lacking in willpower. Those views shaped society's responses to drug abuse, treating it as a moral failing rather than a health problem, which led to an emphasis on punitive rather than preventative and therapeutic actions. Today, thanks to science, our views and our responses to drug abuse have changed dramatically.").

1B1.3(a)(1). *See* PSR ¶¶ 32, 64. In PA092808, Ms. Rainbird was charged with over a dozen counts, all relating to the highspeed chase of her motorhome on May 21, 2019. On October 15, 2020, she pleaded guilty to several counts and was sentenced to 8 years in prison. *Id*. She is currently serving this state sentence.

As discussed below, relevant state court documents demonstrate that (1) in 2019, Ms. Rainbird was charged in three separate state prosecutions, (2) the conduct in all three state prosecutions overlaps with the conduct charged in the federal indictment, (3) the resolution in PA092808 was intended to resolve all three prosecutions. Therefore, Ms. Rainbird's sentence should be adjusted for the time served so far in state custody and the remainder of her federal sentence should run concurrent per U.S.S.G. 5G1.3(b).[4]

**PA092808 (San Fernando)**: In this case, Ms. Rainbird was charged with over a dozen counts, all relating to the highspeed chase of her motorhome on May 21, 2019. This fraudulent purchase of the motorhome in victim M.S.'s name forms the factual basis for Counts 7 and 10-12 of the federal Indictment. Dkt. 4. Additionally, Counts 13-14 of the federal indictment relate to various access devices and the identification of M.T., all of which were possessed on May 21, 2019 (the day of the high-speed motorhome chase) and found inside the motorhome. Lastly, for the *exact* conduct to which Ms. Rainbird pleaded guilty, the PSR includes a +2 enhancement for reckless endangerment during flight under U.S.S.G. § 3C1.2. PSR ¶ 46-47.

---

[4] U.S.S.G. 5G1.3(b) provides:
   If subsection (a) does not apply, and a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction under the provisions of subsections (a)(1), (a)(2), or (a)(3) of §1B1.3 (Relevant Conduct), the sentence for the instant offense shall be imposed as follows:

   (1)   the court shall adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons; and

   (2)   the sentence for the instant offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment.

**GA104771 (Burbank):** In this case, Ms. Rainbird was charged with three counts of identity theft in violation of PC 530.5(c)(2). This charge corresponds to Counts 6, 8, and 9 in the federal indictment. Both prosecutions involve purchases in the name of victim A.S. In August 2020, the Burbank court continued the matter "for one final pretrial conference with the understanding that a settlement will be reached in the San Fernando case." Ex. C at 14. The Burbank case was dismissed a few weeks later. While the conduct in this case predates the motorhome incident, the docket notation and timing strongly suggests that resolution of PA092808 was intended to resolve this case, as well.

**PA092020 (San Fernando - Santa Clarita):** In this case, Ms. Rainbird was charged with one count of identity theft in violation of PC 530.5(c)(2). These charges appear to correspond to the victim W.O. in Counts 1-5 in the federal indictment. The state moved to dismiss PA092020 on October 15, 2020 -- the same day that Ms. Rainbird pleaded guilty to the above PA092808 case. *See* Ex. D at 9. Although the conduct predates the motorhome incident, the timing of the dismissal strongly suggests again that the resolution in PA092808 was intended to resolve this case.

Because the BOP will not automatically credit Ms. Rainbird for the time served on the state case, the Court should adjust her sentence accordingly as contemplated by U.S.S.G. § 5G1.3(b) app. n.2(C).[5] Ms. Rainbird has been in state custody for Case No. PA092808 since her May 21, 2019 arrest. On the date of her federal sentencing (August 21, 2023), she will have served 1554 days (or 51.09 months) on that case. The defense suggests the following language for the Judgment & Commitment Order:

---

[5] Application note 2(C) to U.S.S.G. § 5G1.3(b) provides:

Imposition of Sentence.—If subsection (b) applies, and the court adjusts the sentence for a period of time already served, the court should note on the Judgment in a Criminal Case Order (i) the applicable subsection (e.g., §5G1.3(b)); (ii) the amount of time by which the sentence is being adjusted; (iii) the undischarged term of imprisonment for which the adjustment is being given; and (iv) that the sentence imposed is a sentence reduction pursuant to §5G1.3(b) for a period of imprisonment that will not be credited by the Bureau of Prisons.

|   |   |
|---|---|
| 1 | Pursuant to the Sentencing Reform Act of 1984, it is the |
| 2 | judgment of the Court that the defendant, Julie Ann Rainbird, |
| 3 | is hereby committed on Counts 6 and 13 of the 14-Count |
| 4 | Indictment to the custody of the Bureau of Prisons for a term |
| 5 | of ___ months to commence immediately. The term of ___ |
| 6 | months is hereby reduced by 51 months for a total federal |
| 7 | confinement of ___ months pursuant to section 5G1.3(b)(2). |
| 8 | Sentence for the instant Federal Sentence shall be imposed |
| 9 | today to run concurrently for the remainder of undischarged |
| 10 | term of imprisonment pursuant to 5G1.3(b)(2) in California |
| 11 | Superior Court, County of Los Angeles, Case No. PA092808. |

In the alternative, if the Court disagrees with the application of U.S.S.G. § 5G1.3(b) to this case, the Court may use its discretion to impose a partially concurrent sentence under U.S.S.G. 5G1.3(d).[6] Federal courts generally "have discretion to select whether the sentences they impose will run concurrently or consecutively with respect to other sentences that they impose, or that have been imposed in other proceedings, including state proceedings." *See Setser v. United States*, 132 S. Ct. 1463, 1468 (2012); 18 U.S.C. § 3584(a). Exercise of that discretion, however, is predicated on the court's consideration of the factors listed in 18 U.S.C. § 3553(a), including any applicable guidelines or policy statements issued by the Sentencing Commission. A partially concurrent sentence is appropriate here for the reasons discussed above, mainly that much of the state conduct overlaps with the federal indictment, that Ms. Rainbird's federal guidelines have been enhanced by 2 levels for the exact conduct she already

---

[6] U.S.S.G. § 5G1.3(d) provides:
   (Policy Statement) In any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense.

13

pleaded guilty to, and a concurrent sentence would allow her to return to CCTRP to complete her rehabilitation journey and ensure a successful reentry into society.

## IV. CONCLUSION

For these reasons, the defense submits a sentence of 41 months in custody to run concurrent to her state sentence is appropriate and no greater than necessary to achieve the goals of sentencing.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: August 8, 2023            By /s/ Elena Sadowsky
                                 ELENA SADOWSKY
                                 Deputy Federal Public Defender
                                 Attorney for JULIE ANN RAINBIRD